# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CRAIG M. BLUEDORN, | ) | |
| MELISSA L. BLUEDORN, | ) | |
| individually and on behalf of | ) | |
| SAVANNAH CLARK, d/o/b 10/28/1996, | ) | |
| a minor, as Parent and next of Kin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:07-cv-0839 |
| | ) | Judge Trauger |
| MARK J. WOJNAREK, individually and as | ) | |
| Sheriff Deputy for the MONTGOMERY | ) | |
| COUNTY SHERIFF'S DEPARTMENT, | ) | |
| BILLY WALL, individually and as | ) | |
| Sheriff Deputy for the MONTGOMERY | ) | |
| COUNTY SHERIFF'S DEPARTMENT, | ) | |
| JOHN STONE, individually and as | ) | |
| Sheriff Deputy for the MONTGOMERY | ) | |
| COUNTY SHERIFF'S DEPARTMENT, | ) | |
| NORMAN LEWIS, individually and as | ) | |
| Sheriff of MONTGOMERY COUNTY | ) | |
| SHERIFF'S DEPARTMENT, | ) | |
| and MONTGOMERY COUNTY, TENNESSEE,) | | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is Defendants' Motion for Summary Judgment (Docket No. 39), to which the plaintiffs have responded (Docket No. 58), and the defendants have replied (Docket No. 61). Also pending is Plaintiffs' Rule 59(e) Motion to Alter or Amend (Docket No. 66), seeking permission to file a sur-reply to the defendants' summary judgment motion and

1

Plaintiffs' Motion for Reconsideration of Order of October 3, 2008 and *Daubert* Motion (Docket No. 69), to which the defendants have responded (Docket No. 70).

As the court has considered the sur-reply attached to the plaintiffs' motion to alter or amend in ruling on the motion for summary judgment, the plaintiffs' motion to alter or amend will be granted. The defendants' motion for summary judgment will be granted in part and denied in part, and the plaintiffs' motion for reconsideration will be denied.

## BACKGROUND

This case arises out of a traffic stop that took place on August 29, 2006 in Montgomery County, Tennessee.

That evening, a domestic shooting took place on Bartons Creek Road in Montgomery County, Tennessee.[1] At 8:34 p.m., Deedra Hall placed a call to 911 to report that her father, Norman Hall, was shooting at her brother, Gary Hall. During the call, Ms. Hall informed the 911 operator that she was hiding in a field and did not know whether her brother had been shot. She also informed the operator that her brother had left in a black Pontiac Grand Am.

The Montgomery County Sheriff's Office[2] ("Sheriff's Office") dispatched patrol units to the scene of the shooting. The shooter, Norman Hall, was waiting in the driveway when the patrol units arrived and surrendered peacefully. At 9:01 p.m., one of the responders reported to dispatch that Norman Hall was contained. The victim, Gary Hall, had briefly left the scene but

---

[1]Unless otherwise noted, the facts are drawn from Plaintiffs' Responses to Defendants' Statement of Undisputed Material Facts (Docket No. 51) and Defendants' Responses to Plaintiffs' Statement of Additional Undisputed Facts (Docket No. 59).

[2]Defendant Norman Lewis is the Sheriff for Montgomery County, Tennessee. The other three individual defendants, Mark Wojnarek, Billy Wall, John Stone, are Sheriff Deputies for the Montgomery County Sheriff's Department.

returned to provide a statement to the police. Other than Norman Hall and Gary Hall, there were no other shooters nor any other victims of the Bartons Creek shooting.

After the scene was secured, investigators from the Sheriff's Office Domestic Violence unit, including Deputies Mark Wojnarek, John Stone, and Fred Smith, were dispatched to the scene.[3] As investigators, the deputies' role was to gather evidence, take photographs, and speak with suspects, victims, and witnesses. Generally, investigators are dispatched to a crime scene only after it is secured. When he was dispatched, Deputy Wojnarek was briefed on some of the contents of the 911 call and, in turn, briefed Deputies Stone and Smith. Deputy Stone rode to the scene alone, and Deputies Wojnarek and Smith rode together behind Deputy Stone.

Meanwhile, also on the evening of August 29, 2006, the plaintiffs were at home when Mrs. Bluedorn's water broke. At the time, Mrs. Bluedorn was thirty-nine weeks pregnant. The Bluedorns and Mrs. Bluedorn's nine-year old daughter left their home at approximately 10:15 p.m. to drive to the hospital. Mr. Bluedorn drove the family's gold sport utility vehicle down Highway 48/13 toward the hospital with the car's emergency flashers activated.

As the Bluedorns traveled down the road, Deputy Stone passed them in the other direction as he was on his way to the scene of the Bartons Creek shooting. Deputy Stone observed that the Bluedorns' car was coming from the general vicinity of the shooting, and testified that he believed Mr. Bluedorn was speeding.[4] Deputy Stone contacted Deputy Wojnarek, who was behind him at some distance, and informed Deputy Wojnarek that he would

[3]A fourth investigator, Josh Wall, who shares a last name with defendant Billy Wall, was dispatched directly to the scene and was not involved in the traffic stop involving the plaintiffs.

[4]Mr. Bluedorn denies that he was speeding. (Docket No. 53 ¶ 6.)

3

soon pass a speeding vehicle with its emergency flashers activated. Deputy Stone also advised Deputy Wojnarek that someone connected with the shooting—possibly a suspect—might be in the vehicle. Deputy Wojnarek and Deputy Smith, with whom he was traveling, subsequently observed the vehicle Deputy Stone had described, and both testified that they also believed the car was speeding. Deputy Wojnarek pulled behind the Bluedorns' car and activated his lights and sirens.

When Mr. Bluedorn observed the deputies behind him, the Bluedorns were approximately five miles from the hospital and thirteen to fourteen miles from the scene of the Bartons Creek shooting. Mr. Bluedorn did not stop immediately because he was on a bridge where there was insufficient room to stop safely, which the defendants acknowledge. Instead, Mr. Bluedorn pulled over where there was an adequate shoulder, within a mile of when Deputy Wojnarek first activated his lights and sirens. Mr. Bluedorn also slowed to forty-five miles per hour, the posted limit beyond the bridge, and took no evasive action. In the meantime, however, Deputy Smith reported to dispatch that he and Deputy Wojnarek were attempting to stop a vehicle and that the vehicle would not stop. Deputy Billy Wall heard Deputy Smith's report over his radio and proceeded to Highway 48/13, traveling in the opposite direction of the Bludorns and Deputies Wojnarek and Smith.

When Deputy Wall observed the Bluedorns' car coming toward him with Deputies Wojnarek and Smith following, he pulled into the middle turn lane and then into the oncoming lane, hitting the front of the Bluedorns' car and effectively boxing them in between his vehicle in

the front and Deputy Wojnarek's vehicle in the rear.[5]  Deputy Wall got out of his vehicle, drew

his weapon, and pointed it at the Bluedorns' vehicle.[6]  Deputy Wojnarek also exited his vehicle,

which was behind the Bluedorns', drew his weapon, and pointed it in the direction of the driver's

side of the Bluedorns' car.[7]

The Bluedorns immediately yelled to inform the deputies that they were on their way to

the hospital because Mrs. Bluedorn's water had broken.  However, Deputy Wall ordered Mr.

Bluedorn to put his hands up, get out of the car, and get down on the ground, which Mr.

Bluedorn did, at gunpoint.  During this time, Mrs. Bluedorn and her daughter remained in the

car, crying and continuing to shout that they were on their way to the hospital because Mrs.

Bluedorn's water had broken.

Deputy Smith, having heard Mr. Bluedorn yell "my wife's pregnant," left the vehicle and

walked toward the Bluedorns' car, where he quickly confirmed that Mrs. Bluedorn was, indeed,

pregnant.  Deputy Smith informed Deputies Wojnarek and Wall and instructed them to put their

weapons away, which they did.[8]  Deputy Smith then radioed the dispatcher to change the call

---

[5]According to the Bluedorns, Deputy Wall "rammed" their car, causing approximately
$500 in damage.  Although the defendants do not deny contact between Deputy Wall's vehicle
and the Bluedorns' vehicle, they dispute the plaintiffs' characterization of the severity of the
contact between the two vehicles, pointing out that none of the Bluedorns suffered any physical
injury as a result of the contact and that the Bluedorns declined to have the damage repaired.
(Docket No. 59 ¶ 10; Docket No. 61 at 5.)

[6]The defendants deny that Deputy Wall pointed his weapon in the direction of the
vehicle, but acknowledge that he pointed it at the Bluedorns, who were in the vehicle at the time,
which seems like a distinction without a difference.  (Docket No. 51 ¶ 38.)

[7]Again, the parties dispute whether Deputy Wojnarek's gun was pointed at Mr. Bluedorn
or at the Bluedorns' car.  (Docket No. 51 ¶ 40.)

[8]The defendants assert that Deputy Wall independently realized that Mrs. Bluedorn was
pregnant and holstered his gun without being instructed to do so by Deputy Smith.  (Docket No.

5

from a traffic stop to a traffic stop with a medic.[9]  At some point, Deputy Wojnarek informed Mr. Bluedorn that they believed he may have been a suspect or a victim in the Bartons Creek shooting.

When an ambulance arrived, the deputies insisted that Mrs. Bluedorn travel to the hospital by ambulance, although she preferred to travel with her husband.  The deputies permitted Mr. Bluedorn to drive Mrs. Bluedorn's daughter to the hospital in his car.  Throughout the entire course of the stop, the Bluedorns and Mrs. Bluedorn's daughter were completely cooperative with the officers.  They had no weapons and did not attempt to flee, evade, or resist the officers in any way, and Mr. Bluedorn was not charged with any crime or given a citation.

## ANALYSIS

The plaintiffs brought this suit under 42 U.S.C. § 1983, alleging that the defendants' actions violated their rights under the Fourth and Fourteenth Amendments to the Constitution.[10]  Because the Fourth Amendment "provides an explicit textual source of constitutional protection" for the plaintiffs' claims, which are rooted in allegations that the traffic stop constituted an illegal seizure and that the deputies used excessive force during the course of the stop, the claims will be analyzed under that provision rather than under the "more generalized notion of 'substantive due process.'"  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  In addition to their

_____

51 ¶¶ 44-45; Docket No. 59 ¶ 129.)

[9]The defendants assert that both Deputies Wall and Smith radioed for a medic.  (Docket No. 51 ¶¶ 46, 49.)

[10]The Complaint additionally contained claims under the Fifth and Eighth Amendments (Docket No. 1 ¶¶ 10, 25, 35, 42, 43), but the plaintiffs have waived those claims and acknowledge that their § 1983 claim is properly analyzed under the Fourth and Fourteenth Amendments (Docket No. 58 at 21).

6

constitutional claims, the plaintiffs also allege a variety of claims against the defendants that arise under Tennessee state law.

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of

7

evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II. Federal Claims

The defendants have moved for summary judgment with respect to the plaintiffs' claims, asserting that the individual defendants are entitled to qualified immunity and that the defendant Montgomery County is not liable, as the plaintiffs have failed to identify a municipal policy or custom underlying the constitutional violations asserted by the plaintiffs. (Docket No. 39.)

### A. Individual Defendants

The plaintiffs asserted claims against the four individual defendants in both individual capacities and official capacities. (*See* Docket No. 1.) As a claim against an individual in his or her official capacity is the equivalent of a claim against the governmental entity that employs him or her, *e.g.*, *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994), the plaintiffs' official capacity claims against the individual defendants will be considered as such. With respect to the individual capacity claims, the defendants assert that they are entitled to qualified immunity.

In order to minimize the "general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service," the Supreme Court has recognized qualified

8

immunity as an affirmative defense against an alleged violation of a constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982); *Caudill v. Hollan*, 431 F.3d 900, 911 (6th Cir. 2005). The Supreme Court has developed a two-part test to determine if the qualified immunity defense is available. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Goad v. Mitchell*, 297 F.3d 497, 501 (6th Cir. 2002). The first step requires the court to consider, in the light most favorable to the party asserting the injury, whether the facts alleged show the official's actions violated a constitutional right. *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). The qualified immunity inquiry comes to an end if a constitutional right would not have been violated were the allegations established. *Id.* The second step in the qualified immunity analysis is to determine whether the violated right was clearly established. *Id.* When determining whether a right was clearly established, the court must undertake the inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* "Qualified immunity [is] defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)) (emphasis original to *Harlow*).

            1.      Mark Wojnarek, John Stone, and Billy Wall

The plaintiffs' allegations against Deputies Wojnarek, Stone, and Wall stem from the defendants' conduct prior to and during the traffic stop on August 29, 2006. The plaintiffs allege that the conduct of these defendants constituted an illegal seizure and the use of excessive force in violation of the Fourth Amendment. (Docket No. 58 at 22-28.) The defendants counter that the seizure was permissible and that the degree of force used was objectively reasonable and did not constitute a violation of the Fourth Amendment. (Docket No. 40 at 8-16.)

9

First, with respect to the legality of the seizure itself, the defendants assert that Deputy Wojnarek's personal observation of the Bluedorns' car was sufficient to justify the stop. (Docket No. 40 at 13.)  A decision to stop a car is reasonable where there exists probable cause to believe that a traffic violation has occurred.  *Whren v. United States*, 517 U.S. 806, 810 (1996) (cited in *Schneider v. Franklin County*, No. 07-3732, 2008 U.S. App. LEXIS 16806, at *9 (6th Cir. Aug. 4, 2008)).  Deputy Wojnarek estimated that the Bluedorns were traveling at seventy miles per hour, fifteen miles per hour above the legal speed limit, before the stop.  (Docket No. 40 at 109.)  He likewise received a report from Deputy Stone that the car was speeding (Docket No. 40 Ex. 6 at 106), and Deputy Smith, who was in the car with Deputy Wojnarek, also testified that the car was going approximately sixty-five miles per hour, as judged by the speed registered on the speedometer in the deputies' car while they were following the Bluedorns (Docket No. 41 Ex. 3 at 15).[11]  Therefore, Deputy Wojnarek had sufficient reason to believe, based on his own observations and the report from Deputy Stone, that Mr. Bluedorn was traveling faster than the posted speed limit, and thus there was probable cause to justify the stop.  Therefore, to the extent that the plaintiffs' § 1983 claims are based on the argument that the stop was illegal from the outset, as the defendants lacked probable cause or reasonable suspicion, summary judgment will be granted to the defendants.

The court next turns to the plaintiffs' allegations about the manner in which the stop was conducted—namely, that the deputies used excessive force during the course of the stop.  First, with respect to the claims against Deputy Stone, the defendants argue that those claims should be

---

[11]Despite the fact that Mr. Bluedorn categorically denied speeding in his affidavit (Docket No. 53 ¶ 6), during his deposition he seemed to acknowledge that he might have been, saying "[i]t was nothing excessive."  (Docket No. 62 Ex. 7 at 16.)

10

dismissed, as Deputy Stone was not present during the traffic stop. (Docket No. 40 at 17.) It is undisputed that, after he observed the Bluedorns' vehicle and reported his observations to Deputy Wojnarek, Deputy Stone proceeded to the scene of the shooting and thus was not present for the traffic stop and did not participate directly in any of the actions alleged to violate the plaintiffs' right to be free from the use of excessive force. The plaintiffs have presented no arguments as to why their excessive force claims against Deputy Stone should not be dismissed. Therefore, the plaintiffs' § 1983 excessive force claims against Deputy Stone will be dismissed, although his testimony will remain relevant to the extent that his communications with Deputy Wojnarek formed part of the basis of Deputy Wojnarek's knowledge at the time of the stop.

In determining whether the degree of force employed during a stop is excessive, the applicable inquiry is whether an officer's actions are objectively reasonable in light of the facts and circumstances available to him or her, without consideration of intent or motivation. *Graham v. Conner*, 490 U.S. at 397. In determining whether the use of force was excessive, a court must consider the severity of the crime, the immediacy of the threat posed by the suspects, and whether the suspects were actively resisting or attempting to evade arrest. *Dorsey v. Barber*, 517 F.3d 389, 401 (6th Cir. 2008). Although shows of force, such as the brandishing of weapons, are permissible when necessary to ensure the safety of the officers involved, *see Fisher v. Harden*, 398 F.3d 837, 854, a show of force may constitute excessive force given the circumstances of the particular case*, see Davis v. Bergeon*, No. 98-3812, 1999 U.S. App. LEXIS 17984, at *15-16 (6th Cir. July 27, 1999).

At the time of the stop, Deputies Wojnarek and Stone were on their way to the scene of the Bartons Creek shooting, which had taken place hours earlier. With respect to the shooting, the dispatcher had informed Deputy Wojnarek that there had been a multiple domestic shooting

11

and that the suspect was a white male.  (Docket No. 40 Ex. 1 at 75-76.)  Deputy Wojnarek had

also been informed that a possible victim had warrants on file and had fled the scene.  (*Id.* at 76-

77, 89.)  As Deputy Wojnarek drove toward the shooting, he received an additional report from

Deputy Stone, who was driving ahead of him on the same road, that Deputy Stone had observed

a speeding vehicle with its emergency flashers activated—the Bluedorns' vehicle—coming from

the direction of the shooting.  (*Id.* at 106.)  According to Deputy Wojnarek, Deputy Stone

informed him that there "could be a possibility that [the Bluedorns' vehicle] could be involved

with [the Bartons Creek shooting] that we were en route to."  (*Id.*)

As for Deputy Stone, he testified that he informed Deputy Wojnarek not only that the

Bluedorns' car might be involved with the case, but also that there might be a "suspect" in the

car.  (Docket No. 56 Ex. 10 at 30.)  However, Deputy Stone acknowledged that, at the time he

observed the Bluedorns' car, he was aware that the shooting scene had been secured and that the

sole suspect was in custody.  (*Id.* at 57-58.)  Thus, there was no basis whatsoever for him to

believe that a suspect might be in the car, and his entire basis for believing that the car might

otherwise be involved in the shooting was the fact that he had been informed that "there was

another person at the scene who went missing" (*id.* at 58), even though he was not aware that

one of the possible victims had outstanding warrants and therefore might have a motive to flee

the police (*id.* at 25-26).

A police officer is entitled to rely not only on information he or she has observed

directly, but also information received from others, such as dispatch information and directions

received from other officers.  *Dorsey*, 517 F.3d at 395.  Where an officer's qualified immunity

claim depends on such information, courts must consider whether that information was clear at

the time and on what information the officer was reasonably entitled to rely, considering the

information objectively.  *Id.* at 395-96.  Most of the information available to Deputies Wojnarek and Stone came from the 911 call reporting the Bartons Creek shooting and from the patrol units who initially responded to the scene.  The information provided to both was, at best, incomplete; they were not informed of certain details from the initial 911 call, such as the report that a possible victim had left the scene in a black Pontiac Grand Am.  Moreover, much of the information provided to Deputies Wojnarek and Stone was no longer timely, such as the report that Gary Hall, the individual who had left the scene, had returned shortly after he left and was subsequently interviewed by the police.

Given the information available to them, there was little basis for either Deputy Wojnarek or Deputy Stone to believe that the Bluedorns' car was involved with the Bartons Creek shooting, particularly in light of a number of mitigating facts that were within their knowledge at the time.  First, there was no identity between the Bluedorns' car or the Bluedorns themselves and any of the cars or individuals related to the Bartons Creek shooting.  There was no "be on the lookout" notice nor a description of either a missing person or a car that matched the Bludorns or their vehicle, except to the extent that the suspect in the Bartons Creek shooting had been identified generically as a "white male."  Although the Bluedorns' car was coming from the general vicinity of the shooting, it was over ten miles from the scene at the time of the stop, and, although it was speeding, the officers did not articulate any reason to connect that vehicle with a crime that had occurred hours earlier and miles away.[12]  In short, there was

_____

[12]Indeed, Deputy Smith, who was traveling with Deputy Wojnarek, testified that he did not draw a connection between the Bluedorns' vehicle and the Bartons Creek shooting, although he was not privy to the report that Deputy Wojnarek received from Deputy Stone.  (Docket No. 56 Ex. 90 at 21, 37-38.)

nothing to suggest any particular connection between the Bluedorns and the shooting other than the unsupported speculation of Deputies Wojnarek and Stone.

Second, it is noteworthy that the Bluedorns were traveling with their emergency flashers activated, as flashers serve to draw attention to one's vehicle, undermining the reasonableness of the deputies' conclusion that the Bluedorns might be attempting to flee the scene of the shooting or otherwise evade the police. Additionally, Mr. Bluedorn slowed when he saw Deputy Wojnarek behind him and pulled over as soon as he safely could, within a mile, by Deputy Wojnarek's own estimation, of when Deputy Wojnarek first activated his lights and sirens, demonstrating again that Mr. Bluedorn was not attempting to evade the police but, rather, was driving cautiously under the circumstances. Finally, the Bluedorns were entirely compliant during the course of the stop, a fact that the deputies acknowledged, and there was no indication that the Bluedorns posed any threat to the deputies whatsoever.

While Deputy Wojnarek had little reason to believe the Bluedorns were somehow involved in the Bartons Creek shooting, his conclusion was based in part on information he received from Deputy Stone. However, Deputy Stone had even less reason to believe that the Bluedorns were involved in the shooting than did Deputy Wojnarek, as he knew, when he passed the Bluedorns and made his report about their speeding vehicle to Deputy Wojnarek, that the sole suspect in the shooting was in custody.[13] (Docket No. 56 Ex. 10 at 57-58.) Thus, his assertion that the Bluedorns' car might contain a suspect in the shooting was nothing more than

_____

[13]Deputy Stone's testimony on this point was unequivocal. However, the parties do not dispute that Deputy Wojnarek took the report about the shooting and then briefed his colleagues, including Deputy Stone, and it therefore seems that Deputy Wojnarek also would have known that there was a suspect in custody, if Deputy Stone had this information at the time of the Bluedorn stop.

14

wild speculation in light of the information he had to the contrary. Moreover, Deputy Wojnarek was not justified in relying on this information, as an officer may only rely on information received from other sources when that information is based on reasonable suspicion. *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006). As Deputy Stone did not possess reasonable suspicion on which to base his report to Deputy Wojnarek, neither, in turn, did Deputy Wojnarek. In sum, neither Deputy Wojnarek nor Deputy Stone had anything more than a hunch that the Bluedorn vehicle was involved in the Bartons Creek shooting

As for Deputy Wall, he had even less information available to him than did Deputy Wojnarek. He knew only that Deputy Smith had radioed that Deputies Wojnarek and Smith were following a car that would not stop, and then observed the Bluedorns' car in motion with Deputy Wojnarek's vehicle behind it. He knew nothing of the Bartons Creek shooting or of the speculation on the part of Deputies Wojnarek and Stone that the Bluedorns' car might somehow be connected to the shooting. Additionally, there were, again, mitigating factors within the realm of Deputy Wall's knowledge, notably the fact that the Bluedorns' vehicle was traveling below the speed limit and slowed to a stop while Deputy Wall observed it, contrary to Deputy Smith's report. (Docket No. 41 Ex. 7 at 42-43.) In light of all of this information, Deputy Wall's act of contacting the Bluedorns' vehicle with his own such that he caused damage to the vehicle was not objectively reasonable.

Immediately upon stopping, Mr. Bluedorn attempted to inform the deputies that his wife was pregnant. While Deputies Wojnarek and Wall were physically closer to Mr. Bluedorn at the time, they nevertheless ordered him from the car and onto the ground at gunpoint. During the course of this show of force, it was Deputy Smith, who was still in Deputy Wojnarek's vehicle at the outset, who heard Mr. Bluedorn, got out of the vehicle, looked in the window of the

15

Bluedorns' car, determined quickly that Mrs. Bluedorn was indeed pregnant, and instructed Deputies Wojnarek and Wall to holster their weapons. Although the defendants assert that Deputy Wall, independently of Deputy Smith, determined that Mrs. Bluedorn was pregnant and holstered his weapon, at the very least the show of force lasted long enough for Deputy Smith to make this determination, despite the fact that he was in further physical proximity from the Bluedorns and their vehicle than either Deputy Wojnarek or Deputy Wall.

Moreover, the Bluedorns did not take any evasive action, refuse to cooperate, or present any threat to the deputies whatsoever at any point during the stop. The defendants argue that the show of force lasted less than one minute and did not result in any physical injury to the plaintiffs. Although the show of force was, indeed, brief, the fact remains that it was unwarranted. In light of the facts and circumstances then known to Deputies Wojnarek and Wall, their actions in aiming their guns at the Bluedorns and ordering Mr. Bluedorn from the car and onto the ground with their guns trained on him were not objectively reasonable, and therefore constituted the use of excessive force in violation of the Fourth Amendment.

Turning to the second step of the *Saucier* analysis, a reasonable officer should have known that this show of force during the course of a traffic stop where the plaintiffs presented no threat to the officers was unlawful and in violation of a clearly established constitutional right. First, as a general proposition, an individual's right to be free from the use of excessive force is beyond dispute. *See Abel v. Harp*, 278 Fed. Appx. 642, 651 (6th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 399 (1989)). Second, in *Smoak*, the Sixth Circuit made clear that an "unreasonably intrusive" show of force during the course of a stop, in which the officers "possessed nothing more than a bare inference" of criminal activity, violates the Fourth Amendment. 460 F.3d at 781-82. The court in *Smoak* found in the officers' favor on their

16

qualified immunity defense in that case, noting that prior decisions of the Sixth Circuit had not

made this point clear previously. *Id.* at 782. Now, in light of *Smoak*, it is clear.

Also telling is Deputy Wojnarek's behavior after the stop. In his initial report of the

incident dated August 30, 2006, Deputy Wojnarek conspicuously omitted any mention of the fact

that he and Deputy Wall had unholstered their weapons in the course of effecting the stop.

(Docket No. 55 Ex. C.) Several months later, after plaintiffs' counsel had sent a letter to the

county's mayor noting his representation of the plaintiffs in this matter (Docket No. 55 Ex. G),

Deputy Wojnarek prepared a second, more thorough report detailing the show of force (*see*

Docket No. 55 Ex. D) and was scolded by his supervisor for not originally being forthcoming

about the show of force (*see* Docket No. 40 Ex. 8 at 152-53). It is hard to interpret Deputy

Wojnarek's initial report downplaying or hiding the show of force as anything other than a tacit

recognition on his part that the show of force during the stop was, indeed, unwarranted, if not

also unlawful.

Although the defendants rely on the testimony of Sheriff Lewis and two other Sheriff's

Office superiors that the actions of Deputies Wojnarek and Wall were appropriate under the

circumstances (Docket No. 40 at 16), the significance of this testimony is undermined by the fact

that these individuals are hardly disinterested parties. Finally, the defendants rely on *Dorsey* in

support of their argument that they are entitled to qualified immunity. In that case, the plaintiffs,

who were innocent of any crime, were stopped by the police, made to lie face down on the

ground at gunpoint, handcuffed, and transported to the police station for identification before

being released approximately an hour later, on the suspicion that the plaintiffs were involved in a

crime that occurred a number of miles away. *Dorsey*, 517 F.3d at 391. The Sixth Circuit

reversed the trial court's ruling that the officers were not entitled to qualified immunity with

17

respect to the plaintiffs' claims that the officers lacked reasonable suspicion to stop them and used excessive force in effectuating the stop. However, the facts on which the Sixth Circuit based the *Dorsey* ruling stand in stark contrast to those present here. First, the court relied heavily on the facts that there was a "be on the lookout" notice in effect for two individuals who largely matched the description of the two plaintiffs and that the officers involved had been instructed to hold the plaintiffs until another unit arrived, *id.* at 398, neither of which was the case here. Additionally, the court found that the officers were not aware that the plaintiffs were not suspects until long after the initial stop, *id.* at 402; in this case, it should have been evident almost instantaneously that not only were the Bluedorns not involved with the Bartons Creek shooting, but also that they posed no threat whatsoever to the deputies.

For all of these reasons, neither Deputy Wojnarek nor Deputy Wall is entitled to qualified immunity with respect to the plaintiffs' claims under § 1983 that the deputies used excessive force during the course of the traffic stop.

### 2. Norman Lewis

The plaintiffs assert that Sheriff Lewis is individually liable to the extent that he permitted, encouraged, or tolerated an official pattern, practice, or custom of constitutional violations and failed to reprimand or discipline officers responsible for violating the plaintiffs' civil rights. (Docket No. 1 ¶¶ 21-26.) However, under § 1983, a supervisor may only be individually liable for the actions of his subordinates "when 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it,' or 'at least implicitly approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" *Leary v. Daeschner*, 349 F.3d 999, 903 (6th Cir. 2003) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984), *cert. denied* 469 U.S. 843 (1984)). Here, it is undisputed that

18

Sheriff Lewis was not present at the time of the Bluedorn stop, and there is no indication that

Sheriff Lewis was aware of the stop or of the actions of Deputies Wojnarek and Wall prior to

and during the stop, nor that he in any way encouraged, approved, or acquiesced in the deputies'

conduct.  Therefore, summary judgment will be granted for the defendants with respect to the

plaintiffs' § 1983 claims against Sheriff Lewis in his individual capacity.

      *E.*     *Montgomery County*

      Under § 1983, a municipality bears liability for the constitutional violations of its

employees and agents only where the constitutional violation resulted from the municipality's

policy or custom.  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. Dep't*

*of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th

Cir. 2005).  To prove the existence of a municipal policy or custom, a plaintiff may rely on such

evidence as "(1) the municipality's legislative enactments or official agency policies; (2) actions

taken by officials with final decision-making authority; (3) a policy of inadequate training or

supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  *Thomas*,

398 F.3d at 429.  The plaintiff must demonstrate that the municipality's deliberate conduct was

"the moving force" behind the violation of the plaintiff's civil rights.  *Gregory v. Shelby County*,

220 F.3d 433, 442 (6th Cir. 2000), *abrogated in part by Buckhannon Bd. & Care Home, Inc. v.*

*W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001), *as stated in DiLaura v. Twp. of Ann*

*Arbor*, 471 F.3d 666, 671 n.2 (6th Cir. 2006).

      The plaintiffs assert that the county failed to properly train and supervise the deputies

and that it failed to investigate once it learned of the Bluedorns' allegations.  (Docket No. 58 at

32-35.)  Under § 1983, a municipality may be held liable for a failure to train only if that failure

constitutes a "deliberate indifference" to its citizens' rights.  *City of Canton v. Harris*, 489 U.S.

378, 389 (1989). A plaintiff may establish deliberate indifference by demonstrating a municipality's "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction" or by demonstrating that the municipality "fail[ed] to act in response to repeated complaints of constitutional violations by its officers." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (citing *Harris*, 489 U.S. at 390).

In support of their claims against Montgomery County, the plaintiffs point to the Sheriff's Office's Use of Force policy, which provides for officers' use of "reasonably necessary" force, including non-deadly force "to protect themselves or another from physical harm" and deadly force "to protect themselves or others from death or serious bodily harm." (Docket No. 55 Ex. F.) According to the plaintiffs, Deputies Wojnarek and Wall testified that it is proper to use their firearms under any circumstances where they fear for their lives or the lives of others, and that this belies the deputies' "flawed understanding" of the Use of Force policy. (Docket No. 58 at 32-33.) Contrary to the plaintiffs' assertion, it is not at all clear how the deputies' understanding of the policy is at all flawed. In fact, their interpretation seems entirely consistent with the policy, and thus not indicative of a failure to train the deputies in the proper interpretation and application of the use of force policy, as the plaintiffs claim.

Additionally, the plaintiffs allege that the county failed to investigate the incident adequately. First, the plaintiffs do not argue that any particular incident prior to August 29, 2006 should have been investigated and was not, nor that the county neglected to address prior complaints that would give rise to a finding of deliberate indifference. Additionally, although the plaintiffs complain that the Sheriff's Office lacked an Internal Affairs unit to investigate complaints, there is no evidence that the Sheriff's Office lacked the means altogether to investigate complaints, nor that there was any history or pattern of complaints going unaddressed

by the Sheriff's Office. Instead, as the court understands the plaintiffs' argument, they are asserting that the county's behavior after learning of the stop involving the Bluedorns ratified the unconstitutional conduct and therefore provides evidence of deliberate indifference, much as in the case *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985), *cert. denied* 480 U.S. 917 (1987), in which the Sixth Circuit held that municipal liability could be premised on a sheriff's failure to investigate the beating of a prisoner in police custody. Here, even if the Sheriff's Office declined to formally investigate the incident, as the plaintiffs allege, the evidence demonstrates that the county did take action when it learned of the Bluedorn incident. Deputy Wojnarek was asked to complete a second report detailing the show of force during the stop and was reprimanded by his supervisor for his incomplete first report, and administrators met with Deputy Wall to discuss the incident. As such, the evidence does not demonstrate a failure to investigate on the part of the county that rises to the level of deliberate indifference.

As the plaintiffs have failed to establish a policy or custom such that Montgomery County can be liable under § 1983, summary judgment will be granted for the defendants with respect to these claims.

**III.    State Law Claims**

The plaintiffs have asserted state law claims of assault, battery, intentional infliction of emotional distress, outrageous conduct, and conspiracy against Deputies Wojnarek, Wall, and Stone. (Docket No. 1 ¶¶ 27-31.) The plaintiffs additionally allege a negligence claim against Montgomery County. (Docket No. 1 ¶¶ 32-34, 39-41.)

First, the defendants assert that the court should decline to exercise supplemental jurisdiction over all the plaintiffs' state law claims. (Docket No. 40 at 27-28.)

21

A court may decline to exercise supplemental jurisdiction in certain circumstances, including when the court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3), or "in exceptional circumstances [where] there are other compelling reasons for declining jurisdiction," 28 U.S.C. § 1367(c)(4). As some of the plaintiffs' federal claims have survived summary judgment, § 1367(c)(3) does not apply, and this court will not decline supplemental jurisdiction over all of the plaintiffs' state law claims under this provision.

However, with respect to the plaintiffs' negligence claim against Montgomery County, a compelling reason exists to warrant this court in declining supplemental jurisdiction over that claim under § 1367(c)(4). Namely, the Tennessee Government Tort Liability Act ("GTLA") provides that government entities are not immune from suit "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment," Tenn. Code. Ann. § 29-20-205, and, further, that "[t]he circuit courts shall have exclusive jurisdiction over any action brought under this chapter," Tenn. Code Ann. § 29-20-307. This court has previously held that the GTLA's denomination of the state courts of Tennessee as the proper forum for adjudicating negligence claims against Tennessee governmental entities provides a compelling reason for denying supplemental jurisdiction over such claims. *See, e.g.*, *Harris v. Metro. Gov't of Nashville*, No. 3:06-0868, 2007 WL 4481176 (M.D. Tenn. Dec. 18, 2007); *Beddingfield v. City of Pulaski*, 666 F. Supp. 1064, 1067 (M.D. Tenn. 1987). Therefore, this court will decline to exercise supplemental jurisdiction over the plaintiffs' negligence claim against Montgomery County, and summary judgment will be granted for the defendants on this claim.

IV.    **Motion for Reconsideration and *Daubert* Motion**

Finally, the court will briefly address the Plaintiffs' Motion for Reconsideration of Order of October 3, 2007 and *Daubert* Motion.

22

On October 3, 2007, Magistrate Judge Griffin issued an order granting in part and denying in part the defendants' motion for a protective order. (Docket No. 67.) In the October 3 Order, Judge Griffin ordered the plaintiffs to pay an invoice submitted by James Kubic, the defendants' expert witness, for time that Mr. Kubic spent being deposed by plaintiffs' counsel but denied the defendants' request for attorney's fees associated with seeking the protective order.

In her ruling, Judge Griffin noted that the plaintiffs had not suggested that Mr. Kubic's hourly rate was unreasonable nor that the invoice itself was otherwise unreasonable. She also rejected the plaintiffs' arguments that they should not be responsible for Mr. Kubic's invoice because he failed to appear at his originally scheduled deposition, because he testified that he would not provide expert testimony in a case where he believed there had been excessive force, because he had not spoken with witnesses, visited the scene, or taken photographs or videotapes, because he had not based his opinions on any authoritative texts or reviewed case law, because he was not familiar with documents referenced in his report, and because he does not satisfy the requirements of *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993), as none of these reasons provide a sufficient basis to exempt the plaintiffs from paying Mr. Kubic's fees under Rule 26(b)(4)(C) of the Federal Rules of Civil Procedure. Judge Griffin further noted that the question of whether Mr. Kubic should be permitted to testify is a separate issue that is not relevant to the question of whether the plaintiffs should be obliged to pay the fees associated with deposing him.

First, to the extent that their motion seeks reconsideration of Judge Griffin's ruling that they are responsible for Mr. Kubic's invoice, the plaintiffs essentially restate the arguments that have already been rejected by Judge Griffin. This court may only modify or set aside a

23

magistrate's ruling on a non-dispositive matter if it is found to be clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). As the October 3 Order was thorough and well-reasoned, the plaintiffs' motion for reconsideration of the ruling therein will be denied, and the plaintiffs shall pay Mr. Kubic's fees for the reasons stated by Judge Griffin

Second, to the extent that the plaintiffs' motion seeks reconsideration of Judge Griffin's October 3 Order under *Daubert*, the court notes that no *Daubert* motion was before Judge Griffin. Moreover, the October 3 Order did not purport to be a ruling under *Daubert*, but rather expressly disavowed the notion that the assessment of fees for time spent deposing an expert witness has any bearing on that individual's fitness, under *Daubert*, to testify as an expert witness. The plaintiffs' motion therefore will be denied.

Finally, to the extent that the plaintiffs' motion constitutes a *Daubert* motion made for the first time, the plaintiffs have provided little in the way of law or fact that would either permit the defendants to formulate a response or allow this court to rule on such a motion, and will be denied without prejudice to the plaintiffs' ability to bring a *Daubert* motion at a later date supported by appropriate legal authorities.

## CONCLUSION

For the reasons discussed herein, Defendants' Motion for Summary Judgment will be granted in part and denied in part, Plaintiffs' Rule 59(e) Motion to Alter or Amend will be granted, and Plaintiffs' Motion for Reconsideration of Order of October 3, 2008 and *Daubert* Motion will be denied. The claims remaining for trial include the plaintiffs' excessive force claims against Deputies Wojnarek and Wall and all of the plaintiffs' state law claims, with the exception of the negligence claim against Montgomery County, over which this court will decline to exercise supplemental jurisdiction.

24

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge