IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CRAIG M. BLUEDORN, ) | |
| MELISSA L. BLUEDORN, ) | |
| individually and on behalf of ) | |
| SAVANNAH CLARK, d/o/b 10/28/1996, ) | |
| a minor, as Parent and next of Kin, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 3:07-cv-0839** |
| ) | **Judge Trauger** |
| MARK J. WOJNAREK, individually and ) | |
| BILLY WALL, individually, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Pending before the court are the defendants' Motion for Costs and to Enforce Prior Order Awarding Expert Fees (Docket No. 127), the defendants' Motion for Attorneys' Fees (Docket No. 129), and the plaintiffs' Renewed Motion for Judgment as a Matter of Law, or Alternatively to Alter, Amend or Vacate Judgment or Relief From Judgment or Motion for a New Trial (Docket No. 131). For the reasons discussed herein, the plaintiffs' motion for post-trial relief will be denied, the defendants' motion for attorneys' fees will be denied, and the defendants' motion for costs will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an incident that took place on August 29, 2006 in Montgomery County, Tennessee, in which the plaintiffs, Craig and Melissa Bluedorn and their nine-year-old daughter Savannah, driving to the hospital while Melissa Bluedorn was in labor, were briefly

1

detained by officials from the Montgomery County Sheriff's Department who, incorrectly believing that the Bluedorns might be connected to a shooting in the area that evening, aggressively stopped the plaintiffs' car and drew their guns on the plaintiffs.

On August 15, 2007, the plaintiffs filed their Complaint in this case (Docket No. 1). After extensive discovery, the defendants moved for summary judgment, and the court dismissed some claims and defendants.  (Docket Nos. 71-72.)  On December 2, 2008, the trial began in this case.  On December 5, 2008, the jury returned a verdict in favor of the remaining defendants, Mark Wojnarek and Billy Wall, on the plaintiffs' remaining claims, that is, claims under 42 U.S.C. § 1983, along with state law claims for assault and intentional infliction of emotional distress (IIED).  (Docket No. 123.)

At trial, it was established that a domestic shooting occurred on the evening of August 29, 2006 at 6205 Barton's Creek Road in Montgomery County, Tennessee.[1]  It was also established that Deidre Hall, who was at the Barton's Creek residence at the time of the shooting, called 911 at 8:34 that evening to report that her father, Norman Hall, was shooting at her brother, Gary Hall.  Ms. Hall also reported to 911 that Gary Hall had left the premises in a black Pontiac Grand Am.  At approximately 9:01 that evening, officers arriving on the scene arrested Norman Hall without incident and reported to dispatch that Norman Hall had been contained.  Gary Hall returned to the scene and gave a statement to police shortly before 10 p.m.

After Norman Hall was contained, domestic violence unit investigators, that is, officer Stone, officer Smith, and officer/defendant Wojnarek were dispatched to the scene to investigate

---

[1] The facts, as discussed herein, are largely drawn from the court's memory and notes of the trial, which are confirmed by the facts as discussed in the parties' post-trial briefing.  The record does not contain the trial transcript, as no party has ordered it transcribed.

2

the incident. Specifically, around 9 p.m., Wojnarek received a call at home alerting him to the shooting, and informing him that the suspect was in custody, numerous shots had been fired, and one individual had left the scene. Wojnarek then contacted Stone and Smith about the incident, and they met at the impound lot where the crime scene trailer is located. There, Wojnarek told Stone and Smith that there was an individual missing from the scene, but, at this time, he had no other details about this individual that he could relay. Shortly before 10 p.m., Wojnarek, Smith and Stone left the impound lot headed toward the Hall residence on Highway 48/13; Wojnarek and Smith were traveling in the same vehicle, with Stone pulling the trailer in front of them.

Meanwhile, around 10 p.m. that evening, at the Bluedorn residence, which is located about 10-15 minutes away from the Hall residence, Ms. Bluedorn's water broke. About 15 minutes later, the plaintiffs, that is, Mr. and Ms. Bluedorn and their daughter, left the residence in a gold Chevrolet SUV, headed for the hospital. Mr. Bluedorn drove with his flashers on, as he headed down Highway 48/13, in a direction that happened to take him away from the direction of the Hall residence.

Officer Stone, leading the short caravan of Montgomery County Domestic Violence Unit investigators, noticed the Bluedorn's SUV traveling down Highway 48/13, flashers on, heading away from the general direction of the Hall residence. Stone believed that the car was speeding, that is, traveling between 65 and 70 miles per hour on a road for which the posted speed limit is 55 miles per hour. Mr. Bluedorn contended at trial that he was not speeding, or, if he was, he was going at most a few miles per hour over the limit. Stone also believed that the vehicle could, in some way, be connected to the shooting, largely because the vehicle was coming from the general direction of the crime scene.

Therefore, Stone radioed Wojnarek and Smith behind him, described the speeding SUV,

3

and told them that someone connected to the shooting might be in the car, including, potentially, the individual missing from the scene. The evidence presented at trial indicated that this suspicion was the product of speculation on Stone's part; there were no "be on the look out for" announcements connected to the shooting and no description provided to the police that night would have connected the Bluedorn's car to the shooting. Further, Stone was aware, by this point, that a suspect was in custody at the scene and he was never told there were multiple shooters or suspects. After radioing Wojnarek and Smith behind him, Stone went ahead to the scene of the shooting.

In response to Stone's call, Wojnarek and Smith pulled into a convenience store parking lot and waited for the Bluedorn car to pass them. When it did, they likewise observed the SUV to be speeding, and they pulled behind the Bluedorn car and activated their lights and sirens at approximately 10:27 p.m near the intersection before the McClure bridge. Wojnarek and Smith reported over the police radio, describing the Bluedorn vehicle and indicating that the car might be involved in the earlier shooting.

The plaintiffs could not safely stop on the narrow McClure bridge. Wojnarek and Smith trailed the plaintiffs for about one mile, with lights flashing and siren going, before the plaintiffs pulled over to a safe location. At trial, Wojnarek and Smith testified that the Bluedorn car continued to speed for portions of this mile, and that, after the bridge, there were plenty of safe places for the Bluedorn car to pull over before the location that Mr. Bluedorn selected. That said, Mr. Bluedorn took no evasive action during this approximately one-mile drive.

Meanwhile, officer/defendant Wall, who was on patrol in the area, was traveling on Highway 48/13 headed toward Wojnarek, Smith and the Bluedorns when he heard the radio traffic discussed above. At this time, he saw the Bluedorn car described in the radio transmission

4

coming toward him but also slowing down and pulling over; Wall decided to try and block the car to prevent any escape. Therefore, after activating his lights and siren, Wall pulled over to the shoulder on the opposite side of the road just as the Bluedorn car was pulling over to the shoulder as well. Wall hit the Bluedorn vehicle on the front, apparently after the Bluedorn car had come to a stop. At this time, the parties were five miles from the hospital and fourteen miles from the Hall residence, and the Bluedorns were "boxed in" or "penned in" by the officers' cars.

Wall and Wojnarek exited their vehicles with guns drawn on the Bluedorn car, with Wall pointing his gun at the front windshield of the car, that is, at the Bluedorns, and Wojnarek coming up from behind. On officer Wall's shouted command, Mr. Bluedorn put his hands up and exited the vehicle and then, on officer Wojnarek's command, he went to the ground, face down, with the officers' guns pointed at him. Officer Smith had also exited his vehicle and determined, relatively quickly, that there was a pregnant woman and a child in the car, who were confused, attempting to explain who they were, and pleading with officers not to hurt them or Mr. Bluedorn. At this time, Smith ordered Wall and Wojnarek to holster their guns, which they did, and they helped Mr. Bluedorn up off of the ground. The entire, chaotic incident lasted about two minutes, during much of which Ms. Bluedorn and Savannah were screaming at the police not to shoot Mr. Bluedorn.

Upon realizing the true nature of the situation, officer Smith called for an ambulance, which took Ms. Bluedorn to the hospital, where she delivered her baby early the next morning. While waiting for the ambulance, officers Smith, Wall and Wojnarek attempted to explain to the shaken Bluedorns that they had suspected that the Bluedorns might have been involved in the earlier shooting. There was never any physical contact between the parties and no medical treatment was required for the plaintiffs. At trial, the plaintiffs argued that they had suffered

5

damage to their car, had incurred an ambulance bill, and had been emotionally scarred by the incident, including that their daughter had required counseling.

At trial, it also became clear that there were some concerns involving the officers' initial reporting of what happened during the brief incident involving the Bluedorns.  For instance, Wojnarek's initial internal report of the incident made no mention of guns being drawn during the incident, and, therefore, after more details of the incident slowly emerged over time, his supervisor reprimanded him and directed him to do a second, more complete report.  It was also not clear what happened to Wall's report of the incident, and Wall also failed to start his dashboard camera when he left the car, as he was supposed to have done.

Finally, at trial, the defendants offered testimony from their police practices expert, James Kubic, who testified that he believed that the actions taken by the defendants were reasonable and appropriate under the circumstances.  As noted above, the jury found in favor of the defendants on all claims, that is, the Section 1983 claim, the assault claim, and the IIED claim.  The pending motions followed.

## ANALYSIS

Following the adverse jury verdict at trial, the plaintiffs have timely requested in one motion a renewed motion for judgment as a matter of law under Fed. R. Civ. 50(b), or alternatively, a motion to alter, amend, or vacate the judgment under Fed. R. Civ. P. 59(e), a motion for a new trial under Fed. R. Civ. P. 59(a), or for relief from judgment under Fed. R. Civ. P. 60(b)(6).

In support of these motions, the plaintiffs contend that: (1) the jury's verdict is against the weight of the evidence; (2) certain important jury instructions were not given; and (3) that Mr. Kubic should not have been permitted to testify as an expert.  (See generally Docket No. 132.)

6

The defendants have also filed a motion for attorneys' fees and a motion for costs.

## I.    Standards of Review (Post Trial Motions)

### A.    Rule 50(b)

A motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) **may only be granted where, in viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains for the jury, and all reasonable minds would necessarily find in favor of the moving party.** *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001)**. That is, here, viewing the evidence in the light most favorable to the defendants, the plaintiffs must show that the evidence against the defendants was so overwhelming that no reasonable factfinder could find in the defendants' favor.** *Patton v. Sears, Roebuck & Co.***, 234 F.3d 1269, 1269 (6th Cir. 2000).**

### B.    Rule 59(a)

**While a new trial can be ordered for a wide variety of reasons, generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party."** *Conte v. Gen. Housewares Corp.***, 215 F.3d 628, 637 (6th Cir. 2000).  The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court.** *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.***, 925 F.2d 993, 1002 (6th Cir. 1991).  Here, based on the plaintiffs' briefing, the relevant considerations are: (1) whether the verdict was against the weight of the evidence; (2) whether certain jury instructions should have been given; and (3) whether Mr.**

7

Kubic was improperly allowed to testify as an expert, rendering the proceedings unfair to the plaintiffs.

First, in deciding a motion for a new trial based on the proposition that the verdict is against the weight of the evidence, a trial court may compare and weigh the opposing evidence. *Conte*, 215 F.3d at 637. It may not, however, set aside a jury's verdict simply because the court might have reached a different conclusion or might have drawn different inferences; the jury's verdict should be accepted if it "could reasonably have been reached." *Id.*

Second, a district court's refusal to give a jury instruction constitutes reversible error if: "(1) the omitted instruction [is] a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997). Additionally, a motion for a new trial based on omitted jury instruction(s) should be granted only if the jury instructions, taken as a whole, were "misleading" without the requested instruction(s). *See id.*

Third, as to the admission of Mr. Kubic's expert testimony, the plaintiffs must show that the court made an error in admitting this evidence and that that error was sufficiently "prejudicial" as to warrant a new trial. *Conte*, 215 F. 3d at 638.

C.    Rule 59(e)

A court should grant a motion under Rule 59(e) to alter or amend a judgment when there has been a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice. *GenCorp. v. Am. Intern. Underwriters*, 178

8

**F.3d 804, 834 (6th Cir. 1999).**

> **D.** **Rule 60(b)**

Rule 60(b) provides that a court, for a variety of reasons, "may relieve" a party from a final judgment. Fed. R. Civ. P. 60(b). These reasons include "mistake," "fraud," the judgment is "void," or "any other reason that justifies relief." *Id.* Here, the plaintiffs' motion references rule 60(b)(6), which is the catch-all "any other reason" provision. (Docket No. 131 at 2.) Relief under Rule 60(b)(6) arises from principles of equity, and "courts must apply Rule 60(b)(6) relief only in unusual and extreme situations where principles of equity mandate relief." *Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001) (internal quotation omitted).

## II. Application

It is clear from the facts and the legal standards discussed above that, if the court finds that the evidence presented at trial reasonably supported the jury's verdict, that the jury instructions were appropriate, and that the plaintiff's argument regarding the admission of Mr. Kubic's expert testimony is without merit, then the plaintiffs' motions should all be denied. Therefore, the court will consider the plaintiffs' arguments about the weight of the evidence, the jury instructions, and Kubic's testimony in turn.

> **A.** **The Weight of the Evidence**

As noted above, the plaintiffs claim that the weight of the evidence presented at trial was such that the only reasonable conclusion of the jury would have been to find that the defendants were liable on the plaintiffs' Section 1983 claim, along with the plaintiffs' state

law assault and IIED claims.

        1.        Section 1983 claim

Establishing liability on the Section 1983 claim required that the plaintiffs show that the force used was excessive, that is, in light of all of the circumstances that existed at the time of the stop, the force used by the defendants was objectively unreasonable. (Docket No. 120 at 14-15; *Dorsey v. Barber*, 517 F.3d 389, 401 (6th Cir. 2008)). The plaintiffs argue that the conclusion that excessive force was used is the only reasonable one here, largely because there was such little basis for the stop established during trial. (Docket No. 132 at 7.) The Bluedorn car, perhaps speeding, with its emergency flashers operating, was simply traveling down a road that happened to lead away from the scene, which was more than ten miles away. (*Id.*) The plaintiffs argue that, to the extent the police were looking for an individual who left the scene, they had no more reason to stop the Bluedorns than anyone else. (*Id.*) Therefore, the plaintiffs argue, in light of the tenuous basis for the stop, Mr. Bluedorn's non-evasive conduct during the time that the police were following him, and the plaintiffs' immediate attempts to inform the defendants of their medical situation, the force used (drawing and pointing guns, yelling, ramming the car, boxing the plaintiffs in and ordering Mr. Bluedorn out of the car and to the ground at gunpoint) must be considered objectively unreasonable. (*Id.* at 10-11.)

While this is one way to couch the facts, the full picture of the incident shows that the jury's verdict on the Section 1983 claim was simply not unreasonable. The evidence presented at trial showed that officers Stone, Smith, and Wojnarek headed toward the Hall residence believing that one individual, connected to the shooting, was still unaccounted for.

10

As they proceeded down Highway 48/13, officer Stone got a "hunch" that the Bluedorn SUV, speeding, flashers operating, driving away from the area of the incident, might be connected, in same way, to the incident, at least such that a stop of the speeding vehicle was warranted. Unfortunately, what could have been a simple, brief investigatory stop escalated when Mr. Bluedorn drove for about a mile before finally pulling over. By this point, Stone's initial suspicions that there was something "funny" about the car had been, to some extent, confirmed for officers Wojnarek and Smith. Coming from the opposite direction, officer Wall only heard that there was a car, possibly connected to the shooting, that would not stop for the police; when he saw the car he made the split-second decision to try and block the car to prevent an escape. With nothing yet to assuage their concerns about the vehicle, the officers quickly exited their vehicles, guns drawn, and attempted to control the situation with a show of force and loud vocal commands, which the plaintiffs followed, and the situation quickly and peacefully resolved itself.

The jurors were properly instructed that, "in determining whether a particular use of force was reasonable, you must judge it from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight." (Docket No. 120 at 14; *see also Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009)). While, in hindsight, the escalation of the situation is unfortunate, when viewing the situation from the officer's perspective in the moment, the jury's conclusion that the force used was not excessive "could reasonably have been reached." Indeed, at the time that the officers drew their guns and shouted at the Bluedorns, it was night time, the officers thought that there was an individual missing from the earlier shooting, and the officers were faced with an SUV that had been speeding down

11

the road and had not stopped for the police for about a mile. The officers had no way to know who was in the car, and, once the officers became aware of the plaintiffs' situation, they immediately holstered their guns, stopped giving commands, and attempted to calm and reassure the plaintiffs. In light of all of these bases for taking a somewhat aggressive stance toward the Bluedorns' gold SUV, the jury's conclusion that the defendants' show of force was not excessive was not an unreasonable one. Simply put, the jury's verdict on the Section 1983 claim "could reasonably have been reached," and, therefore, will not be disturbed.

### 2. State Law Claims

As noted above, state law claims for assault and IIED were also submitted to the jury, and the jury found no liability on the part of the defendants on these claims. As the jury was instructed, under Tennessee law, to establish a claim for assault, the plaintiff must show, among other things, that the defendant either intentionally attempted to do harm to the plaintiff or that the defendant conveyed the "unmistakable appearance" of an attempt to do that harm. (See Docket No. 120 at 21.) On the facts discussed above, it was reasonable of the jury to conclude that the officers did not attempt to do harm and did not convey the "unmistakable appearance" of an attempt to do harm; rather, the jury could have reasonably concluded that the officers displayed a show of force to protect and defend themselves in a tense situation, which is distinct from showing an intent to do harm.

Likewise, the jury's conclusion that the defendants were not liable on the theory of intentional infliction of emotional distress was also reasonable. In order to find liability on this claim, the jury would have had to have concluded that the defendants' conduct was

12

"extreme and outrageous," that is, the conduct was "beyond all bounds of decency ... atrocious and utterly intolerable in a civilized community." (Docket No. 120 at 22; *see also Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W. 3d 22, 39 (Tenn. 2005)). Here, the plaintiff argues that "a reasonable jury would have determined boxing in the Bluedorns' vehicle and ramming it, then pointing guns immediately at them with a pregnant lady, and a nine year old in the car, as well as utilizing gratuitous force after they were compliant and being told that they were on their way to the hospital" meets that standard. (Docket No. 132 at 16.) Plainly, if the evidence at trial indicated that this is what actually occurred, the court might be inclined to agree. That said, the trial testimony revealed that the officers had no idea who was actually in the car, and that, as soon as the officers realized who was in the car, the show of force ended almost immediately and the officers attempted to diffuse the situation. In light of this, the jury's conclusion that the officers' conduct was not outrageous is certainly reasonable.

B.      Jury Instruction Errors

The plaintiffs contend that four additional jury instructions should have been given. That is, (1) that the "parties [] have equal standing under the law"; (2) "that officers should employ the least intrusive means reasonably available to verify the officers suspicion in a short period of time"; (3) that "officers may only rely on information received from other sources when that information is based on reasonable suspicion"; and (4) that "excessive force claims may be maintained in the absence of physical contact." (Docket No. 132 at 15-16.)

As noted above, to establish entitlement to post-verdict relief on this ground, the

13

movant must show (1) that the district court's refusal to give a jury instruction was unwarranted given the law, the instructions as submitted, and the movant's theory of the case, and (2) that the failure to give the requested instruction resulted in instructions that were, overall, misleading. *Sutkiewicz*, 110 F.3d at 361.

As to the first requested instruction, that the "parties have equal standing under the law," the plaintiffs provide no basis for this specific instruction; indeed, they make no argument other than to say that they requested this instruction and the failure to provide it was an error. (Docket No. 132 at 15.) The court can locate nothing in the instructions provided that might have indicated to the jury that the parties did not have equal standing under the law, and, therefore, the court does not see, among other things, how the failure to provide this instruction rendered the instructions misleading.

As to the second requested instruction, that the officers "should employ the least intrusive means reasonably available to verify the officers suspicion in a short period of time," the plaintiffs cite *Florida v. Royer*, 460 U.S. 491, 500 (1983). (Docket No. 132 at 15.) Indeed, this language is straight out of the *Royer* opinion. *Id.* That said, this instruction was "substantially covered" by other delivered charges. *See Sutkiewicz*, 110 F.3d at 361. Specifically, the instructions stated, "every person has the right under the Fourth Amendment to the U.S. Constitution not to be subjected to unreasonable or excessive force while being stopped by a law enforcement officer, even if such a stop is otherwise completely legal and made in accordance with due process of law." (Docket No. 120 at 14.) Further, the instructions stated, "[s]ome of the things you may want to consider in determining whether the defendants used excessive force are (1) the extent of the injury

14

suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." (*Id.* at 14-15.) Therefore, the instructions established that, even if the stop at issue was legal, the officers could use no more force than was reasonable under the circumstances, which is, in essence, what the *Royer* quotation is stating as well. Therefore, this argument is without merit.

As to the third requested instruction, that "officers may only rely on information received from other sources when that information is based on reasonable suspicion," the plaintiffs rely on *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006). (Docket No. 132 at 15.) *Smoak* discusses that, in generating the necessary reasonable suspicion to make a stop, an officer may rely on more than his direct observation; he may rely, for instance, on "informant tips and dispatcher information." *Smoak*, 460 F.3d at 779. In support of this requested instruction, the plaintiffs argue that "Wojnarek and Wall testified that they relied upon information that the Bluedorns were linked to the domestic shooting, and the jury may have been confused about what information an officer may rely upon." (Docket No. 132 at 15.) To the court, this instruction would have potentially confused and misled the jury. Again, this was an excessive force case based on the allegation that the defendants' conduct after the stop violated the plaintiffs' rights. There was little question at trial that the stop was justified, at the least because Mr. Bluedorn was speeding.[2]

_____

[2] Indeed, in the court's summary judgment opinion, the court concluded that, as a matter of law, the initial stop was appropriate. (Docket No. 71 at 10.) ("to the extent that the plaintiffs' Section 1983 claims are based on the argument that the stop was illegal from the outset, as the defendants lacked probable cause or reasonable suspicion, summary judgment will be granted to the defendants.")

15

Therefore, such an instruction would have been inappropriate in this legal context and should not have been given.

Finally, the plaintiffs requested the instruction that "excessive force claims may be maintained in the absence of physical contact," and they now claim such an instruction was necessary to prevent juror confusion. (Docket No. 132 at 16.) Plainly, physical contact is not a requirement for the plaintiff to maintain a Section 1983 excessive force claim. *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996). That said, the plaintiffs point to nothing in the jury instructions that indicates that physical contact is a requirement of such a claim. (Docket No. 120 at 14-15.) Furthermore, the instructions repeatedly emphasized the issue of whether the "force" used was reasonable, clearly permitting the notion that the "force" involved might be non-physical. (*Id.*) Also, the instructions clearly state that the plaintiffs were eligible to recover for their "physical or emotional pain and mental anguish ... [and] reasonable compensation for mental or emotional injuries suffered by Plaintiffs and caused by Sergeant Wojnarek or Deputy Wall's conduct may include suffering such as anguish, distress, fear, anxiety, humiliation, grief, shame and worry." (Docket No. 120 at 18.) That there is no "physical contact" requirement is the only possible inference from the proceedings and the instructions, and, therefore, a separate instruction was not necessary under the standard discussed above.

C.      Expert Witness Testimony

The plaintiffs contend that it was error to permit the testimony of James Kubic, the defendants' police practices expert, because his "expert opinion was wholly unreliable under *Daubert*." (Docket No. 132 at 15.)

16

To some extent, the plaintiffs raised the qualifications of Mr. Kubic earlier in these proceedings. In October 2008, in conjunction with a motion for reconsideration on another matter, the plaintiffs provided a page or so of bullet-point argument, some of which challenged Kubic's credentials, background and education. (Docket No. 69.) In its summary judgment ruling, the court denied the motion without prejudice, stating that, even if the plaintiffs' somewhat confusing material could be construed as a *Daubert* motion, there was insufficient material to which the defendants could respond, or on which the court could base a ruling. (Docket No. 71 at 24.) The plaintiffs never made a motion *in limine* objecting to Kubic's testimony, but rather, at the outset of Kubic's trial testimony, they objected to that testimony and stated a desire to voir dire the witness. (Docket No. 133 at 9.) The court denied the plaintiffs' request during a sidebar, noting that the issues on which the plaintiffs sought voir dire (that Kubic had never been to the scene of the accident and that Kubic had received assistance from counsel in drafting his expert report) went to the weight of Kubic's testimony, rather than his qualifications under *Daubert*. (*See id.*)

Now, the plaintiffs seek post-trial relief on similar grounds. That is, they argue that, as established at trial, Kubic never visited the scene prior to providing his opinion, had assistance in drafting his initial report, did not conduct independent research, and had "conflict of interest" concerns about testifying against a police officer because he trains police officers. (Docket No. 132 at 14-15.) In response, the defendants argue that these arguments simply rehash the plaintiffs' earlier objections to Kubic, and that these issues, which were brought out on cross-examination at trial, simply go to the weight of Kubic's testimony. (Docket No. 133 at 9.)

Case 3:07-cv-00839   Document 137   Filed 07/27/09   Page 17 of 24 PageID #: 1586

The Sixth Circuit has explored the standards that the district courts should use in evaluating whether so-called "police practices" experts should be allowed to testify at trial. *See Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994); *Champion v. Outlook Nashville,* 380 F.3d 893, 907-08 (6th Cir. 2004). In *Champion,* in discussing experts who opine on police practices and procedures, the Sixth Circuit clarified *Berry,* noting that, if the proffered expert had "specialized knowledge" and "specific expertise about police activities" with "experience on the subject of criminology or police actions" such that the proffered expert could opine on "discrete aspect[s] of police practices [such as] excessive force, based on particularized knowledge about the area," then the testimony would likely be permissible, particularly if it was supported by strong experiential or educational credentials. *Id.* In sum, the Sixth Circuit has concluded that "the proper actions of individual officers in one discrete situation" is an appropriate field for expert testimony, so long as the expert has sufficient credentials and the testimony will assist the trier of fact. *Id.*

Here, Kubic was a qualified expert under this standard. His direct testimony established that he had devoted his career to the training of other officers in the appropriate level of force to use in a given situation. (Docket No. 100.) Specifically, Kubic spent eight years as a Special Response Team Leader for the Wilson County Sheriff's Department, where he was responsible for training officers in "use of force and firearms." (Docket No. 100 at 2.) After this experience, Kubic has spent the last five-and-one-half years of his career with the Tennessee Law Enforcement Training Academy, serving as a law enforcement instructor in a wide range of areas, including "patrol tactics," and "defensive tactics." (*Id.*) In his direct testimony, he stated that his current "daily teaching

18

responsibilities at TLETA include classes on police procedures and practices and training officers in the use of force." (*Id.* at 3.)

Kubic's testimony also established that he had reviewed the record in this case and that he was familiar with the case and the essentially undisputed facts as to what occurred. (*Id.*) Further, his trial testimony contained a lengthy and informed explanation as to the factors that an officer must consider when approaching a situation like the defendants faced on the night at issue, including detailed, thorough testimony about the limited time frame in which the officer must make a decision. (*Id.*) On this basis, Kubic provided his opinion as to why the force used by the defendants was not excessive. (Docket No. 100 at 3-10.)

In sum, while the plaintiffs continue to raise issues that go to the weight the jury should have given Kubic's testimony, they have proffered nothing that convinces the court that Kubic was not a qualified police practices expert, and Kubic's trial testimony only reinforced the notion that he was so qualified. Therefore, the plaintiffs are not entitled to relief on this ground.

On the basis of the foregoing, the plaintiffs' motion for post-trial relief will be denied.[3]

_____

[3] The plaintiffs also argue that certain statements made by the defendants at trial indicate that the defendants did not give "credible" testimony, and "a reasonable jury could not have found" the defendants to be credible witnesses. (Docket No. 132 at 12-13.) This is not an appropriate argument in a motion for post trial relief. *U.S. v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 343 (6th Cir. 1993)("witness credibility is solely within the jury's province, and this court may not remake credibility determinations.") The plaintiffs also argue that a reasonable jury could only find that the actions of the defendants were "intentional and reckless," such that punitive damages were appropriate. (Docket No. 132 at 17.) As discussed above, the jury's verdict in favor of the defendants was reasonable, and, therefore, the same must be said of the jury's conclusion as to punitive damages.

19

**III.     Defendants' Motion for Costs**

The defendants have moved for costs under Fed. R. Civ. P. 54 and for an order to enforce the court's prior orders awarding expert fees.  (Docket No. 127.)  Specifically, the defendants seek $7,008.85 in costs incurred in defending this litigation, which consists of court reporter fees ($5,270.35), printing costs ($1,613.50), medical record obtainment costs ($20), and parking fees for trial witnesses ($105).  (*Id.* at 2-3.)  The defendants provide an affidavit and exhibits documenting these costs.  (See generally Docket No. 128.)  The defendants also move for an order compelling the plaintiffs to comply with the court's prior orders, which directed the plaintiffs to pay for Mr. Kubic's time at his deposition, which was, as invoiced by Kubic, $1,375.  (Docket No. 127 at 3.)

Fed. R. Civ. P. 54 states that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d).  The Sixth Circuit has concluded that "this language creates a presumption in favor of awarding costs, but allows denial of costs at the discretion of the trial court."  *Knology v. Insight Communications Co. LP*, 460 F.3d 722, 726 (6th Cir. 2006).  Additionally, the Sixth Circuit has identified "several factors a losing party may put forward that may be sufficient to justify a district court in overcoming the presumption in favor of a cost award, including the losing party's good faith, the difficulty of the case, the winning party's behavior, and the necessity of the costs."  *Id.* (internal quotation omitted).  That said, an award of costs against the losing party is still considered a "normal incident of defeat."  *Jones v. Continental Corp.*, 789 F.2d 1225, 1229 (6th Cir. 1986).

Here, the plaintiffs have come forward with little basis for the court to deviate from the standard rule.  The plaintiffs simply, and in conclusory fashion, argue that this was a

20

"close case" in which they acted in "good faith," and the depositions and costs incurred were necessary for the prosecution of the action.  (Docket No. 136 at 1-3.)  Other than these conclusory statements, however, the plaintiffs put forth nothing that would convince the court that the circumstances of this case justify a deviation from the general rule that costs are taxed against the losing party.[4]  Under Sixth Circuit case law, it is the plaintiffs' burden to show that costs are inappropriate, and, based on the plaintiffs' briefing here, they have clearly failed to meet that burden.  Therefore, the court will award the defendants the $7,008.85 in costs that they seek.

As to the Kubic issue, by way of review, on October 3, 2008, Magistrate Judge Griffin ordered that the plaintiffs pay for Kubic's time at his deposition.  (Docket No. 67 at 3.)  As Judge Griffin noted, such fees are to be paid by the party taking the expert's deposition, unless "manifest injustice would result."  (*Id.* at 2 quoting Fed. R. Civ. P. 26(b)(4)(c)).  While the plaintiffs had claimed that they should not have to pay these fees because Kubic, in their opinion, was not a viable expert and because his previously scheduled deposition had been canceled, Judge Griffin concluded that these concerns did not indicate that "manifest injustice" would result from paying the fees and, further, the obligation to pay such expenses is distinct from the viability of Kubic's testimony at trial. (*Id.* at 2-3.)

The plaintiffs moved for reconsideration of this ruling, which this court denied, finding that Judge Griffin's decision was not clearly erroneous or contrary to law, and the

_____

[4] The plaintiffs also state that "the defendant attempted to circumvent their obligation to respond[] to written discovery and make witnesses available for depositions and prepared their own 'expert's' report."  (Docket No. 136 at 3.)  Again, these are simply conclusory allegations, not tied to any substantive argument as to why the court should deviate from the general rule here.

21

court stated that the plaintiffs "shall" pay Kubic's fee. (Docket No. 71 at 24.) Now, in response to the defendants' motion, the plaintiffs only argue that these "fees should be set aside or alternatively reduced, as a portion of his deposition concentrated on his failure to appear at his prior deposition date." (Docket No. 136 at 3.) Through this exceptionally vague statement, the plaintiffs have hardly shown that any previous order to pay Kubic's expert fees was inappropriate nor have they shown that "manifest injustice" would result from paying the fee. Therefore, for the third time, the plaintiffs are ordered to pay Kubic's expert fee.

Therefore, the court awards $8,383.85 in costs to the defendants, that is, $1,375 for Kubic's deposition costs and $7,008.85 in other costs.

IV. Defendants' Motion for Attorneys' Fees

The defendants seek a "reasonable attorneys' fee" under 42 U.S.C. § 1988 in the amount of $75,223 for the work performed by counsel on behalf of all defendants in this case, including those (Montgomery County, Norman Lewis, and John Stone) who were dismissed during pretrial proceedings. (Docket No. 129 at 1.) The defendants' motion is largely a recounting of the events in this case, including the ample discovery and the summary judgment briefing. Within this, the defendants primarily argue that attorneys' fees should be awarded because the court determined, at the summary judgment stage, that the claims against Montgomery County, Lewis, and Stone were without merit and because, despite 15 months of litigation, the plaintiffs never developed a viable theory of damages in this case. (Docket No. 129 at 3.) The defendants argue that counsel's fee ($125 per hour for partners and $110 per hour for associates) is eminently reasonable and the 658.4 hours that counsel (through seven attorneys) spent on this case is perfectly in line with a case of this

22

sort that proceeded for more than a year through discovery, summary judgment briefing and trial. (*Id.* at 4.)

The defendants face an uphill climb on the law here. While 42 U.S.C. § 1988(b) does permit the court, in its discretion, to award a "reasonable attorney's fee" to the prevailing party in "any action ... to enforce a provision of" Section 1983, the Sixth Circuit has construed this language to support attorneys' fees for prevailing plaintiffs in civil rights cases and, therefore, "an award of attorney fees against a losing plaintiff in a civil rights action," while not unheard of, "is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Riddle v. Egensperger*, 266 F.3d 542, 547 (6th Cir. 2001) (internal quotation omitted). A court should generally only award such fees if the plaintiff's claim was "frivolous, unreasonable, or groundless," viewed primarily from the plaintiff's perspective at the time he filed the litigation. *Id.* at 548.

Under this standard, the defendants are clearly not entitled to attorneys' fees. A real and troubling event sparked the plaintiffs' Complaint, and, all indications are that, at the time the plaintiffs filed their Complaint, they reasonably believed that their rights had been violated under the circumstances of the stop at issue in this case. While the plaintiffs initially sued some entities and individuals (Montgomery County, Stone and Lewis) who turned out not to be directly involved in the stop or otherwise did not have liability as a matter of law, this lack of liability was only revealed through discovery and there is no indication that the plaintiffs' claims against these parties were asserted in bad faith or without an honest belief in their legitimacy. Also, contrary to the defendants' argument about damages, the plaintiffs had a concrete damages theory from the outset, which was supported by evidence at trial; that is, that they sustained some property damage and costs

23

associated with the stop and that they suffered significant emotional distress – types of damages that are readily recoverable in a Section 1983 action. *Chatman v. Slagle*, 107 F.3d 380, 385 (6th Cir. 1997).

Therefore, the defendants have simply failed to show that this is an "extreme" Section 1983 case, where the facts and the plaintiffs' conduct entitle the defendants to recover attorneys' fees. The defendants' motion for attorneys' fees will be denied.

<u>CONCLUSION</u>

For the reasons discussed above, the plaintiffs' motion for post-trial relief will be denied, the defendants' Motion for Attorneys' Fees will be denied, and the defendants' Motion for Costs will be granted, with the plaintiffs ordered to pay $8383.85 in costs to the defendants.

An appropriate order will enter.

**ALETA A. TRAUGER**
**United States District Judge**

24